IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

## STATE OF TENNESSEE v. FREDERICK GONZALEZ

**Direct Appeal from the Criminal Court for Williamson County**
**No. I-199-12-B    Henry Denmark Bell, Judge**

---

**No. M1999-00165-CCA-R3-CD - Filed August 10, 2000**

---

The Defendant appeals as of right from his conviction of simple possession of cocaine.  He argues that the trial court erred in failing to suppress the evidence used to convict him because the evidence was the fruit of an unlawful seizure.  We agree;  accordingly, we reverse the Defendant's conviction and dismiss the case against him.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Reversed.**

WELLES, J., delivered the opinion of the court, in which SMITH, J., and WILLIAMS, J., joined.

John Conners, Franklin, Tennessee, for the appellant, Frederick Gonzalez.

Paul G. Summers, Attorney General and Reporter, Lucian D. Geise, Assistant Attorney General, Ron Davis, District Attorney General, Jeff Burks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant, Frederick H. Gonzalez, was indicted by the Williamson County Grand Jury for possession of drug paraphernalia and possession of over 0.5 grams of cocaine with the intent to sell and deliver.  He filed a motion to suppress the evidence obtained against him as the result of an unlawful seizure, but such motion was denied after a hearing.  Prior to trial, the Defendant pleaded guilty to the possession of drug paraphernalia charge, but proceeded to trial on the possession with intent charge.  The jury found the Defendant guilty of the lesser included offense of misdemeanor possession of cocaine.  From this conviction the Defendant appeals as of right, arguing that the trial court erred in denying his motion to suppress.  We agree; accordingly, we reverse the Defendant's conviction and dismiss that charge.[1]

---

[1]Because the Defendant pleaded guilty to the possession of drug paraphernalia charge without reserving a certified question regarding the legality of his seizure, that conviction is not before us; thus, our holding does not affect the Defendant's possession of drug paraphernalia conviction. See Tenn. R. App. P. 3(b).

FACTS

At the hearing on the motion to suppress, Officer Craig Wright of the Franklin Police Department testified that on December 5, 1998, he was patrolling in a residential area of Franklin. He said that he had been given information around midnight from another officer, who received the information from a confidential informant, that the Defendant was "en route" to purchase cocaine on Cadet Lane. The confidential informant had stated that the Defendant would be a passenger in a blue Ford Taurus with damage to driver's side and that the Defendant would purchase the cocaine. Officer Wright was already familiar with both the Defendant and the blue Taurus. While not actively looking for the Taurus, Officer Wright testified that he "thought" he would stop the vehicle if he saw it.

Around 1:00 a.m. on December 5, 1998, Officer Wright saw the blue Taurus in the residential area in which he was patrolling. He had not received any additional information regarding the Defendant, so he did not know whether the Defendant had actually purchased cocaine. This residential area was not the area in which the confidential informant said the Defendant would purchase cocaine. After passing the blue Taurus, which was traveling in the opposite direction, Officer Wright made a U-turn and proceeded to follow the vehicle. He observed the vehicle turn right onto Chickasaw Drive, a dead-end street, without using a turn signal. Upon observing the vehicle turn without signaling, Officer Wright decided to stop the vehicle for making an improper turn. However, Officer Wright also testified that the driver of the Taurus made a "quick turn" and that the turn would not have affected his police vehicle.

Officer Wright followed the vehicle onto Chickasaw Drive where he saw the vehicle stop at the dead-end. The driver of the vehicle, Andrew Rayburn, exited the vehicle and approached the police car, at which point Officer Wright ordered Rayburn to get back into the vehicle and activated his blue lights. Rayburn did as he was ordered, and Officer Wright approached the vehicle. Officer Wright testified that as he approached, he smelled an odor of marijuana coming from the vehicle. He made Rayburn exit the car and found a crack pipe and a razor blade after "patting down" Rayburn. Rayburn was placed under arrest. Upon discovering that the Defendant, who was Rayburn's passenger, had an outstanding warrant for failure to appear on a fireworks violation, the Defendant was arrested and placed in the same patrol car as Rayburn. An audio recorder secretly recorded the conversation between the Defendant and Rayburn.

A search of Rayburn's vehicle uncovered a small amount of cocaine and some drug paraphernalia.[2] After Rayburn and the Defendant were removed from the police vehicle, a bag containing an additional 0.7 grams of cocaine was discovered under the seat where the Defendant had been sitting.

---

[2]Although Officer Wright testified that he smelled an odor of marijuana when he approached the vehicle, the only marijuana found in the vehicle was marijuana residue in a wooden "dugout" inside the glove compartment.

Andrew Rayburn testified that on December 5, 1998, he and the Defendant passed a police vehicle traveling in the opposite direction, and immediately after they passed the police vehicle, it made an "abrupt" U-turn and began following Rayburn. Rayburn anticipated that the police officer intended to pull him over, so he turned right onto Chickasaw, a dead-end road, and stopped his vehicle. Rayburn admitted not using a turn signal when he turned right, but he testified that there was no traffic immediately behind or otherwise near him. Although the police vehicle was behind him, Rayburn testified that it was not yet close enough to have been affected by the turn.

Lieutenant Darrell Cagle testified that he supplied Officer Wright with information from a confidential informant that the Defendant was "en route" to purchase cocaine on December 5, 1998. After giving Officer Wright the original information, Lt. Cagle did not speak with Officer Wright again. He testified that he had received information from the confidential informant before, that prior information from the informant had led to arrests, and that the informant was being paid for information. Lt. Cagle said that he had recruited the informant to work with the police and that to his knowledge, the informant had not provided false information. Lt. Cagle did not testify as to how the informant knew the information, but he did say that the informant was not someone who would be at the drug sale.

After hearing the proof, the trial court denied the Defendant's motion to suppress, finding that if there was a stop, it was a "proper stop" based upon the failure to give a turn signal and the information given by the confidential informant that the Defendant was going to purchase drugs.

The Defendant now asserts that the trial court erred by failing to suppress evidence of the drugs found in Rayburn's vehicle, the drugs found in the police vehicle, and the conversation between the Defendant and Rayburn which was secretly recorded while they were in the police cruiser. He argues that all of the evidence against him was the fruit of an unlawful stop of Rayburn's car; thus, the evidence must be suppressed because it was obtained in violation of his right to be free from unreasonable searches and seizures.

## STANDARD OF REVIEW

When reviewing the grant or denial of a motion to suppress,
[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the application of the law to the facts as found by the trial court is a question of law which the appellate court reviews de novo. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citing Beare Co. v. Tennessee Dept. of Revenue, 858

S.W.2d 906, 907 (Tenn. 1993)). Because the facts presented at the suppression hearing were undisputed, only questions of law are before this Court. Therefore, our review of the record below is de novo. See State v. Daniel, 12 S.W.3d 420, 423-24 (Tenn. 2000).

UNLAWFUL "STOP" OR SEIZURE

The Fourth Amendment to the United States Constitution provides as follows: Unreasonable searches and seizures. – The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Similarly, Article 1, Section 7 of the Tennessee Constitution guarantees

that the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

The intent and purpose of the prohibition against unreasonable searches and seizures found in the Tennessee Constitution has been found to be the same as that found in the Fourth Amendment to the United States Constitution. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998) (citing State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997); Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)). According to the Supreme Court, the intent and purpose behind the Fourth Amendment is to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." Camara v. Municipal Court, 387 U.S. 523, 528 (1967).

Obviously, before the constitutional protections against unreasonable searches and seizures come into play, there must be a search or seizure. The Defendant here challenges the detention of Rayburn and himself in Rayburn's vehicle as a violation of the Fourth Amendment; thus, as a preliminary matter, we must determine whether the Defendant was seized. It has been repeatedly held that the stop of an automobile and the detention of its occupants constitutes a seizure, even if the purpose of the stop is limited and the detention is brief. Wren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 663 (1979); Unites States v. Martinez-Fuerte, 428 U.S. 543, 556-58 (1976); State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997). However, in this case, Officer Wright did not literally "stop" the vehicle in which the Defendant was riding. The vehicle had already come to a stop before Officer Wright had any contact with its occupants. This distinction is important because courts have also repeatedly held that an officer may approach an individual in a public place and ask questions without implicating constitutional protections, whether the individual is in a parked car or walking in a public place. See Florida v. Bostick, 501 U.S. 429,

-4-

434 (1991); <u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983) (plurality opinion); <u>State v. Daniel</u>, 12 S.W.3d 420, 426 (Tenn. 2000); <u>State v. Pulley</u>, 863 S.W.2d 29, 30 (Tenn. 1993); <u>State v. Wilhoit</u>, 962 S.W.2d 482, 486 (Tenn. Crim. App. 1997); <u>State v. Butler</u>, 795 S.W.2d 680, 685 (Tenn. Crim. App. 1990). Such an occurrence is considered a "consensual" police-citizen encounter. <u>See</u> <u>Bostick</u>, 501 U.S. at 434. The Supreme Court has explained the application and reasoning of this rule as follows:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention -- no seizure within the meaning of the Fourth Amendment -- then no constitutional rights have been infringed.

<u>Royer</u>, 460 U.S. at 497-98 (citations omitted); <u>see</u> <u>also</u> <u>Daniel</u>, 12 S.W.3d at 425.

Notwithstanding the right of a police officer to approach an individual in a public place, an encounter between an officer and a citizen will not be considered consensual and will instead be considered a seizure "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (1968); <u>see</u> <u>also</u> <u>Bostick</u>, 501 U.S. at 434-35. A seizure occurs "'if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" <u>Michigan v. Chesternut</u>, 486 U.S. 567, 573 (1988) (quoting <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)); <u>see</u> <u>also</u> <u>INS v. Delgado</u>, 466 U.S. 210, 215 (1984); <u>Daniel</u>, 12 S.W.3d at 425. "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's request or otherwise terminate the encounter." <u>Bostick</u>, 501 U.S. at 439. Some of the factors to consider include the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen. <u>Daniel</u>, 12 S.W.3d at 425-26.

> The Supreme Court has recognized that this test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a

person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

[However,] [w]hile the test is flexible enough to be applied to the whole range of police conduct in an equally broad range of settings, it calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police.

Chesternut, 486 U.S. at 573 (citation omitted).

In Michigan v. Chesternut, the Supreme Court held that the actions of the police in following and then driving their police cruiser alongside the defendant for a short distance did not constitute a seizure. Id. at 574. In analyzing whether a reasonable person would have felt free to leave, the Court noted that the record did "not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement." Id. at 575.

Applying the constitutional standards to the facts presented here, we conclude that the Defendant was seized when Officer Wright ordered the driver to get back into the vehicle and when he activated the emergency lights. The only persons present were Officer Wright, Rayburn, and the Defendant, so the officer's actions were obviously directed towards the Defendant and Rayburn. We believe that the actions of Officer Wright in activating the emergency lights and in ordering Rayburn to return to his vehicle constituted a show of authority such that a reasonable person in the position of either the Defendant or Rayburn would not have felt free to leave. In the context of stopping a moving vehicle, as opposed to a seizure of a parked vehicle, our supreme court has maintained that "[w]hen an officer turns on his blue lights, he or she has clearly initiated a stop." Pulley, 863 S.W.2d at 30. We see little difference, from the perspective of the occupants in the vehicle, in turning on the blue lights behind a moving vehicle and turning on the blue lights behind a parked vehicle. The lights still convey the message that the occupants are not free to leave. This conclusion is consistent with that of courts in other jurisdictions, which have held that the activation of emergency lights before approaching a parked vehicle constitutes a seizure. See State v. Donahue, 742 A.2d 775, 779-80 (Conn. 1999); State v. Mireles, 991 P.2d 878, 880 (Idaho Ct. App. 1999); Lawson v. State, 707 A.2d 947, 950-51 (Md. Ct. Spec. App. 1998); State v. Walp, 672 P.2d 374, 375 (Or. Ct. App. 1983); Wallace v. Commonwealth, 528 S.E.2d, 739, 741-42. (Va Ct. App. 2000); State v. Burgess, 657 A.2d 202, 203 (Vt. 1995); State v. Stroud, 634 P.2d 316, 318-19 (Wash. Ct. App. 1981). As aptly stated by the Maryland Court of Special Appeals, "Few, if any, reasonable citizens, while parked, would simply drive away and assume that the police, in turning on the emergency flashers, would be communicating something other than for them to remain." Lawson, 707 A.2d at 951. Ordering an occupant to return to the vehicle, as was done here, serves to enhance that communication. See Daniel, 12 S.W.3d at 426-27 (noting that initial encounter, which was not seizure, was not accompanied by order to stop and answer questions, by drawn weapon, by demand for identification, or by physical restraint). A reasonable person would not think that he or she could simply get in his or her vehicle and drive away after being ordered by a police officer to return to the vehicle,

especially when the only persons present are the police officer and the occupants of the vehicle and when the officer has activated the emergency lights.

Though holding that the activation of emergency equipment, coupled with the ordering of an occupant to return to his or her vehicle, constitutes a seizure, we are cognizant of the difficult decisions police officers face daily in the exercise of their duties. We realize that when officers desire to question citizens without reasonable suspicion to do so, they may also want to activate their emergency equipment for their own safety so that they will be visible to others. Likewise, officers may want to keep multiple occupants of a car together in that car to ensure the officers' safety. Under our decision, police officers who wish to question individuals may be faced with the unsettling choice of whether to activate their emergency equipment for their safety and run the risk of later suppression of any evidence obtained as a result of their questioning or whether to forego questioning the individuals altogether. Such a dilemma does not, however, alter our result. We must follow the directives of the United States and Tennessee Constitutions as interpreted by the United States Supreme Court and the Tennessee Supreme Court. Under those directives, the test for determining whether a seizure occurs examines the circumstances from the standpoint of the citizen, not the police officer. See Chesternut, 486 U.S. at 573; Daniel, 12 S.W.3d at 425. If a reasonable person would not feel free to leave due to an officer's show of authority, that constitutes a seizure, regardless of why the officer made a show of authority.

REASONABLENESS OF SEIZURE

Having found that the Defendant was seized, calling into play the protections of the United States and Tennessee Constitutions, we must now determine whether that seizure was reasonable. Under both the United States and Tennessee Constitutions, a search or seizure conducted without a warrant is presumed unreasonable. Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); Simpson, 968 S.W.2d at 780; State v. Watkins, 827 S.W.2d 293, 295 (Tenn. 1992). Therefore, evidence seized as a result of a search or seizure conducted without a warrant must be suppressed unless the State proves by a preponderance of the evidence that the search was reasonable. Id.

Generally, for the seizure of an automobile and occupants to be reasonable, there must be some type of individualized suspicion of wrongdoing justifying the seizure. It has been deemed reasonable to seize an automobile and its occupants if an officer has probable cause to believe that a criminal offense has occurred or that a traffic violation has occurred. See Wren, 517 U.S. at 810; Prouse 440 U.S. at 655, 659; Vineyard, 958 S.W.2d at 734. If the officer has probable cause to believe that a violation of the traffic code has occurred, the seizure will be upheld even if it is a complete pretext for the officer's subjective motivations in making the stop. Wren, 517 U.S. at 813-17; Vineyard, 958 S.W.2d at 734-35. Similarly, it has been deemed reasonable to temporarily seize an automobile and occupants for investigation in the absence of probable cause if a police officer has reasonable suspicion, based on specific and articulable facts, that the occupants have been involved in or are about to be involved in criminal activity. See Ornelas v. United States, 517 U.S. 690, 693 (1996); Terry v. Ohio, 392 U.S. 1, 30 (1968); Simpson, 968 S.W.2d at 780; Vineyard, 958 S.W.2d at 734.

-7-

The State urges us to conclude that the seizure was justified (A) because Officer Wright had probable cause to believe that the driver of the vehicle in which the Defendant was riding violated a provision of the traffic code by failing to give a signal when turning and (B) because Officer Wright had reasonable suspicion, based on the information from the informant, that the Defendant had been involved in criminal activity. We reject both contentions.

A. PROBABLE CAUSE

> The relevant section of our traffic code governing turning movements provides as follows: Turning movements. -- (a) <u>No person shall turn a vehicle at an intersection</u> unless the vehicle is in proper position upon the roadway as required in § 55-8-140, or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course or move right or left upon a roadway, unless and until such movement can be made with reasonable safety. No person shall so turn any vehicle <u>without giving an appropriate signal</u> in the manner provided in §§ 55-8-143 and 55-8-144 <u>in the event any other traffic may be affected by such movement</u>.

Tenn. Code Ann. § 55-8-142 (emphasis added). Similarly, another section, entitled "Signals for turns," provides:

> Every driver who intends to start, stop or turn, or partly turn from a direct line, shall first see that such movement can be made in safety, and <u>whenever the operation of any other vehicle may be affected by such movement</u>, shall give a signal required in this section, plainly visible to the driver of such other vehicle of the intention to make such movement.

<u>Id.</u> § 55-8-143(a) (emphasis added). Thus, a turn signal is only required by law when another vehicle may be affected by the turn.

Here, Rayburn testified that there was no traffic directly behind or around his vehicle. He further testified that the officer's vehicle would not have been affected by the turn. Officer Wright also testified that he was not affected by Rayburn's turn. Because no other vehicles could have been affected by Rayburn's movement, Rayburn did not violate any provision of the traffic code by failing to give a signal. It follows that Officer Wright, by reason of his observations, did not have probable cause to believe that a traffic violation had occurred. Therefore, Officer Wright did not have probable cause to seize the Defendant and Rayburn in Rayburn's vehicle. See <u>State v. Ronald Wayne Smith</u>, No. M1999-01439-CCA-R3-CD, 1999 WL 1103492, at *6 (Tenn. Crim. App., Nashville, Dec. 7, 1999).

B. REASONABLE SUSPICION

Likewise, Officer Wright did not have reasonable suspicion to believe that the Defendant was involved in criminal activity, thereby making the seizure lawful. It is well established that the facts forming the basis for the officer's probable cause or reasonable suspicion need not rest upon the personal knowledge or observation of the officer. See Adams v. Williams, 407 U.S. 143, 147 (1972); Simpson, 968 S.W.2d at 780. However, when a seizure is based on the tip of an informant, the danger of false reports becomes a concern. Pulley, 863 S.W.2d at 31. Consequently, we must apply tests for determining the reliability of an informant's tip. Id. Under Tennessee law, to establish probable cause based on an informant's tip, there must be a showing of both the informant's credibility and his or her basis of knowledge. See State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989). Although reasonable suspicion "requires 'a lower quantum of proof than probable cause,'" these Jacumin factors are useful in considering the reliability of an informant's tip for establishing reasonable suspicion as well as probable cause. Pulley, 863 S.W.2d at 31 (citation omitted). The difference is that reasonable suspicion may be established by tips that are less reliable. See id.; State v. Kelly, 948 S.W.2d 757, 761 (Tenn. Crim. App. 1996). Our supreme court has maintained that "while independent police corroboration could make up deficiencies in either prong [of the test for reliability], each prong represents an independently important consideration that 'must be separately considered and satisfied in some way.'" Jacumin, 778 S.W.2d at 436 (citation omitted).

> In examining independent police corroboration of an informant's tip,
> [i]t is difficult to define with precision the quantity of corroboration necessary to demonstrate the informant's veracity [or basis of knowledge]. Certainly, more than the corroboration of a few minor elements of the story is necessary, especially if those elements involve non-suspect behavior. It is equally certain, though, that the police need not corroborate every detail of an informant's report to establish sufficient evidence of his veracity [or basis of knowledge].

State v. Moon, 841 S.W.2d 336, 341 (Tenn. Crim. App. 1992) (quoting United States v. Bush, 647 F.2d 357, 363 (3rd Cir. 1981)).

Here, there was limited evidence as to the informant's credibility, but absolutely no evidence as to the informant's basis of knowledge. Lt. Cagle testified that he had recruited the informant to work for the police, that the informant had provided information in the past, and that the information had been reliable. Lt. Cagle did not, however, reveal how the informant knew the Defendant was going to buy cocaine. Had Officer Wright corroborated more of the information provided by the informant, then perhaps he would have had reasonable suspicion to seize the Defendant, but he did not do so. The only information corroborated was that the Defendant was in a blue Taurus with damage to the driver's side, with another individual. This information, standing alone, was completely innocent. See State v. Coleman, 791 S.W.2d 504, 506 (Tenn. Crim. App. 1989) (stating that the fact that a car identified by an informant was registered in the name of the person implicated by the informant was "innocent in and of itself"). Officer Wright testified that he knew the Defendant and that he was familiar with the blue Taurus as a vehicle that would contain the

Defendant. Officer Wright did not see the Defendant in the Taurus in the area of Franklin where the informant said the Defendant was going to purchase cocaine. Also, Officer Wright did not see the Defendant until an hour after he had been informed that the Defendant was "en route" to purchase cocaine. Upon these facts, we cannot find that the informant's information was sufficiently corroborated. Because the State failed to establish both the informant's credibility and his basis of knowledge, we conclude that the informant's tip did not provide Officer Wright with reasonable suspicion to believe that the Defendant had been involved in criminal activity. Therefore, the seizure of the Defendant violated both the United States and Tennessee Constitutions, and the fruits of that seizure must be suppressed.

## CONCLUSION

We hold that the trial court erred in failing to suppress the evidence obtained against the Defendant. All of the evidence against the Defendant, including the drugs found in Rayburn's vehicle, the drugs found in the police vehicle, and the conversation secretly recorded inside the police cruiser, was obtained in violation of the constitutional prohibition against unreasonable searches and seizures. Therefore, we reverse the Defendant's conviction for simple possession of cocaine and dismiss the case against him.

_____
DAVID H. WELLES, JUDGE