# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 26, 2012 Session

## STATE OF TENNESSEE v. JOSEPH SCOTT TURK

**Appeal from the Criminal Court for Hamilton County**
**No. 278567     Barry A. Steelman, Judge**

_____

**No. E2011-02472-CCA-R3-CD - Filed December 5, 2012**

_____

The Defendant, Joseph Scott Turk, was indicted for simple possession of marijuana, a Class A misdemeanor; possession of drug paraphernalia, a Class A misdemeanor; failure to obey a traffic control device, a Class C misdemeanor; failure to operate a motor vehicle within a single lane of traffic, a Class C misdemeanor; failure to use a turn signal, a Class C misdemeanor; driving under the influence (DUI), first offense, a Class A misdemeanor; violation of the implied consent law, a Class A misdemeanor; and possession of an open container of an alcoholic beverage while operating a motor vehicle, a Class C misdemeanor. See Tenn. Code Ann. §§ 39-17-418, -17-425, 55-8-109, -8-123, -8-143, 55-10-401, -10-406, -10-416. The Defendant filed a suppression motion alleging that the arresting officer lacked a reasonable suspicion to stop his car. The trial court denied the Defendant's motion. The Defendant subsequently entered into a plea agreement with the State. The Defendant pled guilty to DUI, first offense, and received a sentence of eleven months, twenty-nine days with forty-eight hours to be served in confinement and the remainder to be served on unsupervised probation. As part of the plea agreement, the remaining charges were dismissed and the Defendant reserved a certified question of law for appellate review pursuant to Tennessee Rule of Criminal Procedure 37(b)(2). In this appeal, the Defendant contends that the trial court erred by denying his motion to suppress the evidence against him. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

Mike A. Little, Chattanooga, Tennessee, for the appellant, Joseph Scott Turk.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; William H. Cox, III, District Attorney General; and Bret Steven Alexander, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

In the early morning hours of May 4, 2010, Deputy Shane Rominger of the Hamilton County Sheriff's Department was traveling west on East Brainerd Road when he saw the Defendant's car turn right onto East Brainerd Road from a "controlled intersection." At the suppression hearing, Deputy Rominger explained that the intersection was controlled by a traffic light. Deputy Rominger testified that as he approached the intersection, he had a green light, "which would mean [the Defendant] had to have . . . the red light." According to Deputy Rominger, the Defendant "made a right turn onto East Brainerd Road heading west . . . in front of [Deputy Rominger], but he failed to stop at the intersection" before turning. Deputy Rominger reiterated that he saw the Defendant's car approach the intersection and that the Defendant never came close "to a complete stop" prior to turning onto East Brainerd Road.

Deputy Rominger testified that after the Defendant turned onto East Brainerd Road, the Defendant's car was "taking up two lanes of travel, straddling basically the [dotted] white line" separating the fast and slow lanes on the westbound side of East Brainerd Road. Deputy Rominger explained that "the wheels on the left side of [the Defendant's] car were occupying the [fast] lane [and] the wheels on [the] right side of his car [were] occupying the [slow] lane." Deputy Rominger estimated that the Defendant traveled "a little more" than 200 feet with his car "straddling" the dotted white line before the Defendant settled into the slow lane. At the intersection of East Brainerd Road and Gunbarrel Road, the Defendant turned right onto Gunbarrel road "without signaling the turn." However, there were no other cars in the area, and Deputy Rominger did not testify that the Defendant's failure to turn affected his driving in any way.

After the Defendant turned onto Gunbarrel Road, the Defendant "[w]ent a short distance . . . in the slow lane . . . and he crossed into the fast lane, . . . back into the slow [lane], swerving into the other lane, then coming back." Deputy Rominger testified that the Defendant swerved into the fast lane "[a]t least once, maybe more," on Gunbarrel Road. Deputy Rominger further testified that the Defendant failed to signal a lane change as he swerved between the fast and slow lanes on Gunbarrel Road. According to Deputy Rominger, at this point, he "initiated a [traffic] stop" and activated his "blue lights." Deputy

-2-

Rominger testified that the Defendant continued on approximately two more blocks before he "[j]ust stopped in the right-hand lane."

The Defendant testified that prior to turning onto East Brainerd Road, he had a red light so he "stopped a few feet behind the [stop] line . . . for a second." According to the Defendant, after stopping, he "rolled out to the edge [of the intersection] and then sort of yielded again because" the distance between the "stop line" and the intersection was "so far" and his view was "obstructed by [] bushes." The Defendant clarified that he did not stop a second time at the intersection, but he instead "just made a cautious turn." The Defendant testified that he did not see any other cars traveling "in [his] lane" and that he did not "see any headlights coming" towards him prior to turning onto East Brainerd Road.

The Defendant denied that he "straddled" both the fast and slow lanes on East Brainerd Road for 200 feet. The Defendant admitted that he "wasn't staying in the lane," but he claimed that was because he had "turned a little wide when [he] turned out." The Defendant claimed that it "took [him] a second" to decide which lane he wanted to be in because he was discussing with his girlfriend which way they needed to go. The Defendant denied that he "turned wide" because he was traveling at a high rate of speed and reiterated that he "briefly" crossed over the lane line. The Defendant further explained that he thought "straddle" was an "extreme" description of his driving. The Defendant claimed that his "tire probably just went over the line" and that the "majority of [his] car was in the right-hand lane."

The Defendant admitted that he turned onto Gunbarrel Road without using his turn signal. However, the Defendant testified that "[t]here wasn't any other traffic around" to signal to. The Defendant claimed that he did not remember seeing Deputy Rominger a few car lengths behind him. Instead, the Defendant claimed that Deputy Rominger was "not right behind [him]" and that there were no cars "right in [his] lane." The Defendant admitted that when he turned onto Gunbarrel Road his car "drifted over [into the fast lane] for a second." The Defendant testified that when Deputy Rominger "blue-lighted" him, he did not immediately stop because Deputy Rominger "was really close to the back of [his] car." Instead, the Defendant claimed that he "took time to slow down" before stopping.

The trial court noted that there was no video of the traffic stop and that its ruling on the motion to suppress was based upon the testimony from Deputy Rominger and the Defendant. The trial court characterized the issue of whether the Defendant failed to stop at the red light as "a swearing match" between Deputy Rominger and the Defendant. The trial court stated that it did "not have to determine whether the [D]efendant stopped at the stop light." The trial court reasoned that the ultimate issue was whether Deputy Rominger "reasonably believed that [the Defendant] had either committed a crime or was about to

commit a crime," and not whether the Defendant actually failed to stop at the red light. With regards to the issue of whether the Defendant failed to stop at the red light, the trial court concluded that "the officer testified that he believed that the [D]efendant ran the red light, regardless of whether the [D]efendant did run the red light, the officer believed that he did, and so that goes into the bank of totality of the circumstances."

The trial court accredited Deputy Rominger's testimony that the Defendant "straddled" the lane line on East Brainerd Road for 200 feet and concluded that it "was a fairly pronounced straddling of the lanes, which would be another basis for a reasonable and articulable suspicion." The trial court concluded that the Defendant's failure to signal his turn onto Gunbarrel Road did not provide Deputy Rominger with probable cause to stop the Defendant because there was no evidence that the Defendant's failure to use a turn signal affected traffic. However, the trial court accredited Deputy Rominger's testimony that the Defendant swerved into the fast lane and then back into the slow lane as he turned onto Gunbarrel Road. The trial court also accredited Deputy Rominger's testimony that the Defendant continued to drive "some distance" before he stopped. The trial court concluded that "all of these factors . . . establish[ed] a reasonable and articulable suspicion" and denied the Defendant's motion to suppress.

After the trial court's ruling on the suppression motion, the Defendant entered into a plea agreement with the State. At the plea submission hearing, the State presented the following factual basis for the Defendant's guilty plea:

> The [D]efendant performed poorly on [several] standard field sobriety tests, specifically the one-leg stand, and also had a liquor bottle in his pocket in his shorts that was mostly empty . . . .
>
> The officer determined that he was too impaired to drive a motor vehicle and arrested him for DUI. He was asked and read an implied consent form, which he refused implied consent in this case.

As part of the plea agreement, the Defendant reserved the following certified question of law for appellate review by this court: "[W]hether the [trial court] erred in finding that the officer had reasonable suspicion supported by specific and articulable facts to stop the vehicle of the [D]efendant."

## ANALYSIS

The Defendant contends that the trial court erred by denying his motion to suppress the evidence gained as a result of the traffic stop. The Defendant argues that the State failed

to establish that he turned onto East Brainerd Road without stopping at the red light. The Defendant also argues that he "briefly crossed the dividing lines of two lanes in the same direction of travel after each turn" and that these actions did not amount to a failure to operate his vehicle in a single lane of traffic. The Defendant further argues that his right turn onto Gunbarrel Road without using a turn signal did not affect traffic; therefore, it did not amount to a traffic violation. The State responds that the trial court did not err in denying the Defendant's motion to suppress. The State argues that the trial court "implicitly accredited Deputy Rominger's testimony" that the Defendant failed to stop at a red light. The State also argues that it established at the suppression hearing that the Defendant "failed to maintain a single lane of traffic on two occasions." The State further argues that Deputy Rominger's driving was affected by the Defendant's failure to use a turn signal.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, an appellate court's review of the trial court's application of law to the facts is conducted under a de novo standard of review. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. Any warrantless search or seizure is presumed to be unreasonable and requires the State to prove by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement. State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998). However, a police officer may make an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed. Terry v. Ohio, 329 U.S. 1, 20-21 (1968); Binette, 33 S.W.3d at 218.

A police officer must have such a reasonable suspicion in order to stop a vehicle without a warrant. State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002). Our supreme court has stated that "when an officer turns on [his] blue lights," a seizure has occurred. State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993). Reasonable suspicion is determined by an examination of the totality of the circumstances. Binette, 33 S.W.3d at 218. Circumstances

relevant to an analysis of reasonable suspicion include "the officer's objective observations [and any] [r]ational inferences and deductions that a trained officer may draw from the facts and circumstances known to him." State v. Yeargan, 958 S.W.2d 626, 632 (Tenn. 1997).

Tennessee Code Annotated section 55-8-143(a) provides that:

> Every driver who intends to start, stop or turn, or partly turn from a direct line, shall first see that that movement can be made in safety, and whenever the operation of any other vehicle may be affected by such movement, shall give a signal required in this section, plainly visible to the driver of the other vehicle of the intention to make such movement.

(emphasis added). As this court has previously held, "a turn signal is only required by law when another vehicle may be affected by the turn." State v. Gonzalez, 52 S.W.3d 90, 99 (Tenn. Crim. App. 2000). Other than Deputy Rominger, "there was no traffic directly behind or around [the Defendant's] vehicle." Id. Deputy Rominger did not testify that his driving was affected by the Defendant's failure to signal the turn onto Gunbarrel Road. Therefore, "[b]ecause no other vehicles could have been affected by [the Defendant's] movement, [the Defendant] did not violate any provision of the traffic code by failing to give a signal." Id. Accordingly, we conclude that the Defendant's failure to give a signal did not provide Deputy Rominger with a reasonable suspicion to stop the Defendant.

Tennessee Code Annotated section 55-8-109(a) provides that "[t]he driver of any vehicle . . . shall obey the instructions of any official traffic-control device applicable thereto." Likewise, Tennessee Code Annotated section 55-8-110(a)(2)(A) provides that:

> A right turn on a red signal shall be permitted at all intersections within the state; provided, that the prospective turning car shall come to a full and complete stop before turning and that the turning car shall yield the right-of-way to pedestrians and cross traffic traveling in accordance with their traffic signal; provided, further, such turn will not endanger other traffic lawfully using the intersection.

Deputy Rominger testified that he watched the Defendant's car turn right onto East Brainerd Road without stopping at the red light. The Defendant admitted that he had a red light, but he claimed that he stopped before making the turn. The Defendant's failure to stop at the red light would have provided Deputy Rominger with a reasonable suspicion to stop the Defendant. Because there was no video of the traffic stop, we are limited in our review to the testimony of the witnesses at the suppression hearing and the trial court's findings of fact. However, the trial court failed to make a finding of fact as to whether the Defendant stopped

-6-

at the red light. Instead, the trial court concluded that Deputy Rominger's belief that the Defendant failed to stop went "into the bank of totality of the circumstances."

We need not determine whether the Defendant stopped at the red light before turning onto East Brainerd Road because the trial court concluded that the Defendant failed to operate his vehicle in a single lane of traffic on two occasions. Tennessee Code Annotated section 55-8-123(1) provides that:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety.

The Tennessee Supreme Court has held that "occasionally drift[ing] from the center of the lane" does not create a reasonable suspicion to justify a traffic stop. Binette, 33 S.W.3d at 219. To hold otherwise would create

> a "stop at will" standard for police since it is the rare motorist indeed who can travel for several miles without occasionally varying speed unnecessarily, moving laterally from time to time in the motorist[']s own lane, nearing the center line or shoulder[,] or exhibiting some small imperfection in his or her driving.

Id. at 219-20 (alterations in original). Additionally, this court has stated that "we do not think that a momentary drift out of a lane constitutes driving a vehicle outside of a single lane." State v. Ann Elizabeth Martin, No. E1999-01361-CCA-R3-CD, 2000 WL 1273889, at *6 (Tenn. Crim. App. Sept. 8, 2000).

However, the trial court accredited Deputy Rominger's testimony that the Defendant did more than merely momentarily and slightly weave out of his lane. Deputy Rominger testified that the Defendant's car was "taking up two lanes of travel, straddling basically the [dotted] white line" separating the fast and slow lanes on East Brainerd Road for approximately 200 feet. Likewise, Deputy Rominger testified that after the Defendant turned onto Gunbarrel Road, he "[w]ent a short distance . . . in the slow lane . . . and he crossed into the fast lane, . . . back into the slow [lane], swerving into the other lane, then coming back." The Defendant argues that he simply "turned wide" when he turned onto East Brainerd Road and Gunbarrel Road and that his driving was not as erratic as Deputy Rominger alleged. However, questions concerning credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted the trial court at a suppression hearing. The evidence does not preponderate against the trial court's decision

to accredit Deputy Rominger's testimony over the Defendant's testimony. The evidence at the suppression hearing established that the Defendant failed to operate his vehicle in a single lane of traffic for approximately 200 feet on East Brainerd Road and again for a short distance on Gunbarrel Road; therefore, Deputy Rominger had a reasonable suspicion to stop the Defendant. Accordingly, we conclude that the trial court did not err by denying the Defendant's suppression motion.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE